1

**J. SCOTT BURRIS**
Nevada Bar No. 10529

2

**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP**
300 South 4th Street, 11th Floor

3

Las Vegas, NV  89101
(702) 727-1400; FAX (702) 727-1401

4

J.Scott.Burris@wilsonelser.com

5

Attorneys for Plaintiff Nikkei Global Inc.

6

**UNITED STATES DISTRICT COURT**

7

**DISTRICT OF NEVADA**

8

| | |
|---|---|
| Nikkei Global Inc., a California corporation, | CASE NO.: |
| Plaintiff, | |
| vs. | |
| Co-Partner Consortium ("Partner-CO"), a Nevada general partnership associated in fact and as an enterprise per 18 USCA § 1961(3); Mr. Phillip Ziade,  Nevada resident and co-partner; Mr. Jude E. Nassar, an individual resident of Clark County, Nevada; Appleton Properties, LLC, a Nevada limited liability company; Z Leb Group, LLC, a Nevada limited liability company; Progressive Construction, Inc. a/k/a Growth Construction, a Nevada corporation; Growth Development, LLC a/k/a Growth Construction, a Nevada limited liability company; Vibrant Realty, LLC, a Nevada limited liability company; AJ Properties International, LLC, a/k/a AJ1, a Nevada limited liability company; AJ Properties International Series 2 LLC, a/k/a AJ2 a Nevada limited liability company; Growth Holdings, a Nevada corporation; Growth Luxury Homes, LLC, a/k/a GLH, a Nevada limited liability company; Growth Luxury Realty, LLC, a/k/a GLR, a Nevada limited liability company; Mr. Yoshimi Hirooka a resident of Japan or Singapore, doing business in Nevada;  Mr. Yoshihiro Hirooka, a resident of Japan or Singapore doing business in Nevada; Hirooka Family Office, Ltd., a foreign organization doing business in Nevada, | **COMPLAINT**<br><br>**Jury Demanded**<br><br>Diversity Jurisdiction<br><br>Amount in controversy > $75,000 |
| Defendants. | |

1379800v.4

Plaintiff Nikkei Global Inc., ("NGI") by and through its attorneys of record, J. Scott Burris and the law firm of Wilson Elser Moskowitz Edelman & Dicker LLP, pursuant to claims for racketeering per 18 USCA § 1964(c) (RICO Act); civil conspiracy; misappropriation of trade secrets per NRS 600A.030 *et seq*.; mail fraud and wire fraud per 18 USCA §§ 1341, 1343; common law fraud; negligent misrepresentations; breaches of fiduciary duties; intentional interference with contractual relations; intentional interference with prospective economic advantages; defamation; breach of contract; breaches of the duty of good faith and fair dealing—both contractual and tortious; punitive damages per NRS 42.001, *et seq*., and NRS 600A.050(2); attorney's fees per NRS 600A.060; declaratory and equitable relief, including a preliminary injunction and a constructive trust; alleges based on information and belief as follows:

# I.    OVERVIEW OF THE "GENERAL PARTNERSHIP" OR JOINT VENTURE OF NGI AND PARTNER-CO

1.    The lead defendant Co-Partner Consortium ("Partner-CO"), is a common enterprise, a general partnership associated *in fact,* and an "enterprise" per 18 USCA § 1961(3), controlled by and for the benefit of defendant Mr. Phillipe Ziade, who disregarded the separate status of member entities, commingled funds, and used member-entities to commit fraud.

2.    Beginning in 2013, plaintiff NGI and defendant Partner-CO operated as partners (the "General Partnership," a non-party), in an exclusive business relationship, jointly analyzing and selecting real estate projects in or near Las Vegas, Nevada while producing and sharing profits based on the combined, synergistic, input of each partner, i.e.:

(A)    NGI possessed a valuable and exclusive client-network (part of NGI's wholly-owned trade secrets); and NGI provided unique services and propriety processes used to initiate, coordinate, and sustain each project as NGI screened, selected, and managed

optimal sub-groups of Japanese clients as short-term joint-venturers with the General Partnership; while,

    (B)    Partner-CO touted brands/trademarks and made promises to coordinate timely improvements to add value to each property/project, which could then be sold at a profit, or leased & managed.

3.    The General Partnership operated generally as follows: (1) NGI and Partner-CO analyzed and selected an underdeveloped parcel of real property in or near Las Vegas, Nevada; then, (2) NGI selected and coordinated prospective short-term venture-partners as Partner-CO coordinated construction improvements and, sometimes, created or used an entity-member of its common enterprise for the joint-venture; and, (3) the joint-venture either sold or leased the property, or both, at a profit for the General Partnership and its joint-venture partners.  The General Partnership of NGI and Partner-CO continued beyond each joint-venture project.

4.    In 2018, NGI discovered that defendants Mr. Ziade and Mr. Jude Nassar were operating as a racketeering enterprise, Partner-CO, which intentionally conspired with Hirooka-CO (i.e., two defendant brothers and their business entity) for unlawful objectives aimed at injuring NGI.

5.    Additionally, and separate from Partner-CO's conspiracy with Hirooka-CO, NGI has discovered that Partner-CO engaged in other racketeering activities through, e.g., fraudulently falsifying a government document (a Certificate of Occupancy) for the purpose of committing a fraud on NGI; mail fraud (18 USCA § 1341) or wire fraud (18 USCA § 1343); conspiracy to engage in racketeering activity (18 USCA § 1962); receiving income directly and indirectly from Partner-CO's pattern of racketeering activities for the unlawful purpose/objective of misappropriating income from NGI via Partner-CO's pattern of racketeering activity; common law fraud, *inter alia.,* as alleged herein.

1379800v.4

## II.   JURISDICTION & PARTIES

6.     This Court has subject matter jurisdiction based on diversity of citizenship pursuant to 28 USCA § 1332, as the plaintiff and defendants have complete diversity of citizenship because no defendant has the same citizenship as plaintiff, and the amount in controversy exceeds $75,000.00.

7.     The Court has personal jurisdiction over each defendant based on their respective or joint: (1) presence in Nevada; (2) engagement in transactions to purchase or sell real properties in or near Las Vegas, Nevada including those that are at issue in this case; (3) ownership of real properties in or near Las Vegas, Nevada, including those that are at issue in this case; (4) minimum contacts with Nevada; (5) purposeful activities directed to Nevada through or against plaintiff NGI, a who has an ongoing presence in Nevada; and/or, (6) conduct giving rise to damages occurring in Nevada.

8.     In addition to racketeering activities and predicate offenses, Partner-CO (always acting as or through Mr. Ziade, at a minimum) has engaged in misappropriation of NGI's trade secrets, fraud, breach of fiduciary duties and contractual duties owed to NGI; and Partner-CO has engaged in misconduct that has given rise to additional claims in law and equity, for which this Court should exercise supplemental jurisdiction over the pendant state law claims pursuant to 28 USCA § 1367.

9.     In addition to the racketeering activities and predicate offenses, Hirooka-CO has misappropriated NGI's trade secrets, Hirooka-CO has breached its contractual agreements with NGI; and Hirooka-CO engaged in other misconduct that has given rise to additional claims in law and equity for which this Court should exercise supplemental jurisdiction over the pendant state law claims pursuant to 28 U.S.C.A. § 1367.

10.     Because of defendants' illegal actions, NGI has been damaged more than $2 million.

11.     The Court's exercise of personal jurisdiction over each defendant is reasonable and fair, as alleged in further detail herein.

4

1379800v.4

A. ***Plaintiff Nikkei Global Inc. ("NGI")***

12.    Plaintiff Nikkei Global Inc. ("NGI" a/k/a "Nikkei Global") is a California corporation doing business in or near Las Vegas, Nevada, with a presence in Nevada providing proprietary information-services about properties in Las Vegas to clients who mostly (or exclusively) reside outside the United States.

13.    NGI has been in an "exclusive business relationship" and affiliated with Mr. Ziade and each or all of the Partner-CO members, either directly or indirectly, since 2013, which NGI refers to in this case as the "General Partnership," a non-party.

B. ***Lead Defendant Partner-CO Is A Common Enterprise***

14.    Defendant Co-Partner Consortium ("Partner-CO") is a common enterprise and, by its conduct—including co-mingling of funds, disregarding separate entities, and uses for fraud—is a general partnership (or joint venture) with a continuous and systematic presence in Nevada comprising defendant individuals or entities identified next.

15.    Defendant Mr. Phillipe Ziade, is an individual resident of Nevada, who controls each member of Partner-CO to commit fraud. Mr. Ziade is the alter ego of Partner-CO and of each of its member entities.  Mr. Ziade has held himself out as a "Partner" of or for plaintiff NGI, e.g.:



アメリカ全土で大成功をおさめたアメリカ不動産業界トップリーダー。
ウォールストリートジャーナル誌をはじめとする全米主要紙で特集される。
CNN や FOX などの全米テレビ番組にて「アメリカ不動産投資の成功者」としてのインタビューを受け、
「アメリカ不動産投資成功の秘訣」についての教育番組など、400 回以上アメリカ全土で放映。
不動産投資成功の要となる、「物件の選定」「リスク管理」「出口戦略」に非常に長け、アメリカ住宅
関連の取引以外にも、全米のホテル開発、住宅開発も手掛ける。
ネバダ州不動産プロフェッショナル第１位を５年以上連続獲得。
現在、不動産の設計、開発、販売、管理から IT、メディカルまで 20 数社のホールディングス会社の代表

 NIKKEI GLOBAL Executive Partner  Appleton Properties Appleton Properties CEO Philippe Ziade( フィリッペ・ジアード)

(A portion of a flyer approved by Mr. Ziade of Partner-CO, who is pictured and identified as an "Executive Partner" of the plaintiff NGI for himself and as CEO of defendant Appleton.)

16.     Mr. Ziade is not entitled to a corporate-veil defense because such a defense would sanction a fraud; or, by his conduct, Mr. Ziade is a general partner of the General Partnership, and of Partner-CO, and of each of its general partners identified below.  Unless stated otherwise, for all allegations stated herein, Mr. Ziade acted: for himself; and as a principal on behalf of Partner-CO; and for each general-partner of Partner-CO, except NGI.

17.     Defendant Mr. Jude E. Nassar, is an individual resident of Nevada, who is a general partner of Partner-CO, by his conduct, with authority to act on behalf of the defendant general-partners of Partner-CO, except NGI.

18.     Defendant Appleton Properties, LLC ("Appleton," as identified in the image above), created April 17, 2008, is a Nevada limited liability company and, by its conduct, Appleton is a general partner of Partner-CO.  Appleton is also a valuable brand name that is rightfully owned by NGI and Partner-CO jointly.

19.     Defendant Z Leb Group, LLC, ("Z-Leb"), created September 17, 2009, is a Nevada limited liability company and, by its conduct, Z Leb is a general partner of Partner-CO.  Z Leb is also a valuable brand name that is rightfully owned by NGI and Partner-CO jointly.

20.     Defendant Progressive Construction, Inc. ("Progressive Co" a/k/a "Growth Construction"), created July 30, 2012, is a Nevada corporation and, by its conduct, Progressive Co is a general partner of Partner-CO.  Progressive Construction and Growth Construction are valuable brand names that are rightfully owned by NGI and Partner-CO jointly.

21.     Defendant Growth Development, LLC ("Growth Development" a/k/a "Growth Construction"), created August 10, 2012, is a Nevada limited liability company and, by its conduct, Growth Development is a general partner of Partner-CO.  Growth Development is also a valuable brand name that is rightfully owned by NGI and Partner-CO jointly.

6

22.     Defendant Vibrant Realty, LLC ("Vibrant"), created August 10, 2012, is a Nevada limited liability company and, by its conduct, Vibrant is a general partner of Partner-CO.  Vibrant is also a valuable brand name that is rightfully owned by NGI and Partner-CO jointly.

23.     Defendant AJ Properties International, LLC ("AJ1"), created April 4, 2013, is a Nevada limited liability company and, by its conduct, AJ1 is a general partner of Partner-CO.

24.     Defendant AJ Properties International Series 2 LLC ("AJ2"), created July 30, 2014, is a Nevada limited liability company and, by its conduct, AJ2 is a general partner of Partner-CO.

25.     Defendant Growth Holdings, LLC, ("Growth Holdings"), created March 19, 2015, is a Nevada limited liability company and, by its conduct, Growth Holdings is a general partner of Partner-CO:



(An excerpt from informational materials prepared with Mr. Ziade, Growth Holdings (identified as "IN PARTNERSHIP WITH," plaintiff NGI.)  Growth Holdings a/k/a "GH" are also valuable brand names that are rightfully owned by NGI and Partner-CO jointly.

26.     Defendant Growth Luxury Homes, LLC (a/k/a "GLH"), created July 28, 2014, is a Nevada limited liability company, and, by its conduct, GLH is a general partner of Partner-CO; and GLH is a valuable brand name as intellectual property that is jointly owned by NGI and Partner-CO.

1379800v.4

27.     Defendant Growth Luxury Realty, LLC (a/k/a "GLR"), created September 19, 2017, is a Nevada limited liability company, and, by its conduct, Growth Luxury Realty is a general partner of Partner-CO; and GLR is a valuable brand name that is jointly owned by NGI and Partner-CO.

**C.      *Co-Defendant Hirooka-CO Is A Common Enterprise Of Defendants: (1) Mr. Yoshihiro Hirooka; (2) Mr. Yoshimi Hirooka; and, (3) Hirooka Family Office, Ltd.***

28.     Defendant Mr. Yoshihiro Hirooka ("Yoshihiro") is a resident of Japan or Singapore with substantial ties to Nevada including ownership and other interests in real property in or near Las Vegas, Nevada.

29.     Yoshihiro signed the NC-NDA of March 26, 2016.  (Ex. 1.)

30.     Yoshihiro has misappropriated and used the trade secrets of NGI (and of the General Partnership), which were created in and came from Nevada; and, Yoshihiro has engaged in other fraudulent and illegal acts for the purpose of harming NGI in Nevada.

31.     Defendant Mr. Yoshimi Hirooka ("Yoshimi") is a resident of Japan or Singapore, with substantial ties to Nevada, including ownership and other interests in real property in or near Las Vegas, Nevada.

32.     Yoshimi signed the NC-NDA of February 17, 2017.  (Ex. 2.)

33.     Yoshimi and Yoshihiro are brothers.

34.     Yoshimi and Yoshihiro are representatives and principals of Hirooka Family Office, Ltd. and its affiliates, agents, associates, and principals.

35.     Defendant Hirooka Family Office, Ltd., ("Hirooka-FO") is a fictional entity referenced in the NC-NDAs and in an improper complaint filed in State Court.[1]

---

[1]  The plaintiff in this action is not a party in the State Court action, which has not progressed passed the pleading phase.  The plaintiffs in the State Court action are two defendants in this action: Mr. Yoshihiro Hirooka and Hirooka Family Office, Ltd.  However, the narrow claims there comprise a very small portion of this case, and was filed without seeking relief from the forum selection clause, which is addressed below under the claim for declaratory relief.

8

1379800v.4

36.     Hirooka-CO is common enterprise, partnership, or affiliation comprising Yoshimi, Yoshihiro, and Hirooka-FO (collectively, "Hirooka-CO").

37.     Defendants Yoshimi and Yoshihiro each control Hirooka-FO and Hirooka-CO.

38.     30 Pebble Dunes, LLC ("30-PD"), created March 1, 2011, is a Nevada limited liability company and, by its conduct, 30-PD might be a general partner of Partner-CO.

### III.     VENUE

39.     Venue is proper in this judicial district under 28 U.S.C. §1391(c) and 28 U.S.C. §1391(b)(3), because defendants are subject to personal jurisdiction in this judicial district and thus are deemed to reside in this judicial district.

40.     Venue is proper in this judicial district under 28 U.S.C. §1391(b)(2) because a substantial part of the damages giving rise to the claims alleged herein are assessed and measured in this judicial district.

41.     Venue is proper in this judicial district pursuant 28 U.S.C. § 1391(c) because Plaintiff is incorporated in Nevada and maintains its principal place of business within the state conducting substantial business activities within this district.

### IV.     FACTUAL ALLEGATIONS

#### A.     Background

42.     Since 2013, NGI has invested substantial time and money developing the General Partnership including the respective brand names using NGI's investments of time and money, and NGI's trade secrets, which expressly include NGI's client contacts, prices, fees, mix of services, project-selection criteria, and other business processes.

(Case No. A-18-775773-C, filed June 7, 2018, with an answer or motion due in the near future, unless the case gets resolved).

1379800v.4

43.   Partner-CO, primarily through Mr. Ziade, has consistently held itself out as a "PARTNER" with NGI:



44.   Indeed, Mr. Ziade has expressly held himself out as well as Appleton, Growth Holdings, Vibrant, and other defendant companies as being "IN PARTNERSHIP WITH" with NGI.

45.   Since 2013, Partner-CO has accepted and retained the benefits of NGI's investments of time and money to develop their General Partnership, the brands, and its propriety business processes and information incorporating NGI's proprietary information, which expressly included information about client contacts, prices, fees, service-mix, processes, etc.

46.   Mr. Ziade used U.S. wires and mails to fraudulently seek NGI's trust; and Mr. Ziade provided regular assurances of his fidelity to their exclusive business partnership—both orally and in writing—and his commitment to "share fees or profit fairly" with NGI.

10

47.     Partners owe each other fiduciary duties of loyalty and care, which necessarily included protection of the trade secrets of NGI and protection of the jointly-owned trade secrets of the General Partnership.

48.     NGI's reliance in good faith on their partnership cannot be overstated, as NGI relied to its ultimate detriment on Partner-CO's commitments not to engage in precisely the harmful conduct that Partner-CO engaged in here.

49.     Since 2013, Mr. Ziade, for himself and Partner-CO, owed NGI a fiduciary duty of loyalty especially with respect to NGI's market—i.e., Japanese joint-venture partners for projects involving the General Partnership in or near Las Vegas, Nevada.

50.     In 2013, Mr. Ziade (for himself and Partner-CO) signed a written agreement with NGI regarding their General Partnership:

    a.  to be "bound by a duty of Confidentiality with respect to their sources and contacts";

    b.  to "maintain complete confidentiality regarding each other [*sic*] business sources and/or their Affiliates and will disclose such business sources only to the named parties pursuant to the express written permission of this party who made available the source"

    c.  "that they will not disclose names, addresses email addresses, telephone … to any contacts by either party to third parties and that they each recognize such contacts as the exclusive property of the respective parties and they will not enter into any direct negotiations or transactions with such contracts revealed by the other party";

    d.  "[t]he parties will not in any manner solicit, nor accept any business in any manner from sources or their affiliates, which sources were made available through this agreement, without the express permission of the party who made available the source";

e. "in the event of circumvention of this Agreement by either party, directly or indirectly, the circumvented party shall be entitled to a legal monetary penalty equal to the maximum service it should realize from such a transaction plus any and all expenses, including but not limited to all legal costs and expenses incurred to recover the lost revenue,"

f. "this Agreement is valid for any and all transaction [*sic*] between the parties herein," etc.

51.     Between 2013 and 2017, Partner-CO had zero "sources" or "contacts" from Japan, except for those made available by NGI through this agreement—i.e., those sources and contacts owned exclusively by NGI, including, of course, Hirooka-CO, *et al.*

**B.      _Hirooka-CO and Partner-CO's Racketeering Activities, Mail & Wire Fraud, And Civil Conspiracy_**

52.     In early 2016, one of NGI's prospective clients, Hirooka-CO, expressed interest in working with NGI.

53.     Hirooka-CO had never competed against NGI and Hirooka-CO had no experience performing NGI's work or performing services in NGI's markets.

54.     Hirooka-CO claimed to have access to a network of potential clients from Hirooka-CO's work in Singapore and Japan, but no experience with real estate in the Continental United States.

55.     In approximately February or March of 2016, Hirooka-CO asked to meet NGI's partner, Partner-CO.

56.     In March 2016, prior to meeting in person, Partner-CO required Hirooka-CO to sign a Non-Disclosure and Non-Circumvention Agreement, dated March 26, 2016, which served to protect

Partner-CO and NGI expressly as an "affiliate" and as a third-party beneficiary.  (Ex. 1, NC-NDA of March 26, 2016.)

57.     Hirooka-CO knew that NGI was a beneficiary of the NC-NDA of March 26, 2016.

58.     Hirooka-CO knew that the NC-NDA of March 26, 2016 was intended to benefit NGI—that the benefits and protections of the NC-NDA of March 26, 2016 served to the benefit and protection of NGI.

59.     Hirooka-CO knew that NGI did in fact rely on the NC-NDA of March 26, 2016, which was foreseeable and obvious.

60.     NGI did in fact rely to its detriment on Hirooka-CO's contractual duties under the NC-NDA of March 26, 2016.

61.     Hirooka-CO breached the NC-NDA of March 26, 2016 and the duty of good faith and fair dealing several times, as alleged herein.

62.      On approximately April 1, 2016, NGI introduced its "source" Hirooka-CO to Partner-CO (via Mr. Ziade) at Roppongi Grand Hyatt hotel in Tokyo, where they conferred for approximately 20 minutes.

63.     By the time of that first meeting with NGI, Partner-CO, and Hirooka-CO, Mr. Ziade had regularly held himself out as a "partner" with NGI with respect to real estate projects in or near Las Vegas, Nevada, as alleged herein.

64.     As alleged above, some of Hirooka-CO's acquaintances became NGI's client contacts for the purpose of being selected as joint-venture partners for projects of the General Partnership.

65.     In approximately January 2017, NGI met with its clients and some of Hirooka-CO's acquaintances.

66.     Mr. Ziade explained that he and his companies were exclusive partners with NGI.

13

1379800v.4

67.     Some of Hirooka-CO's acquaintances expressed interest in becoming clients of NGI (as joint-venturers with the General Partnership).

68.     Hirooka-CO introduced Ms. AS to NGI and Partner-CO.

69.     Ms. AS had been a business partner or acquaintance of Mr. TF, principal representative for Sansei AimConsul Inc. (a/k/a Sansei TimeMaster Ltd.), for a long time.

70.     Mr. TF, as owner and on behalf of Sansei AimConsul Inc., expressed interest in learning about NGI's projects with Partner-CO in and near Las Vegas, Nevada.

71.     Both Sansei AimConsul Inc. and Hirooka-CO engaged in discussions with NGI about opportunities to work with NGI.

72.     As of January 2017, Hirooka-CO had never purchased, developed, or sold property in the Continental United States.

73.     Both Sansei AimConsul Inc. and Hirooka-CO seemed eager to learn about NGI's business.

74.     As is customary, both Sansei AimConsul Inc. and Hirooka-CO agreed to keep NGI's trade secrets (and other confidential information) confidential, and not to compete against NGI.

75.     In early 2017, NGI invited both Sansei AimConsul Inc. and Hirooka-CO to become agents for NGI.

76.     While Sansei AimConsul Inc. became an agent of NGI, Hirooka-CO countered that Hirooka-CO wanted to be a partner with NGI, which put NGI and Hirooka-CO at a temporary impasse.

77.     In early 2017, NGI asked Hirooka-CO for another written memorialization of Hirooka-CO's promise not to compete or disclose confidential information involving NGI.

78.     On February 14, 2017, each partner of Hirooka-CO reconfirmed Hirooka-CO's prior commitments not to compete against NGI and not to disclose NGI's confidential information, as

14

evidenced by a signed non-circumvention and non-disclosure agreement (Ex. 2, NC-NDA of Feb. 17, 2017, signed by Yoshimi as an agent of Hirooka-CO).

79.    NGI's reliance in good faith on the NC-NDA cannot be overstated, as NGI relied to its ultimate detriment on Hirooka-CO's commitments not to engage in precisely the harmful conduct that Hirooka-CO's engaged in here.

80.    On approximately March 11, 2017, Partner-CO discussed with NGI an opportunity for Hirooka-CO to purchase real property owned by Partner-CO, which would be Hirooka-CO's first property purchase in the Continental United States (in Las Vegas, Nevada).

81.    On March 22, 2017, Sansei AimConsul Inc. became an agent of NGI.

82.    Hirooka-CO knew that Sansei AimConsul Inc. entered into the agency agreement with NGI.

83.    Partner-CO also knew that Sansei AimConsul Inc. entered into the agency agreement with NGI.

84.    On approximately March 24-26, 2017, Hirooka-CO traveled through interstate commerce to Las Vegas, Nevada to meet with the General Partnership's representatives and to learn confidential information from the General Partnership including an introduction to client sources of NGI, and trade secrets of the General Partnership.

85.    During the first few months of 2017, Hirooka-CO learned valuable and confidential trade secrets of the General Partnership by interstate wire or mail, or both.

86.    But there were some trade secrets that Partner-CO knew to keep from Hirooka-CO, such as the pricing, service-mix, and profit allocations between NGI and Partner-CO because the proprietary information could be used by Hirooka-CO or others to undermine and compete unfairly against NGI.

15

87.     In April 2017, NGI and Hirooka-CO again met and conferred to discuss NGI's willingness to make Hirooka-CO an agent.

88.     In response, Hirooka-CO again attempted to persuade NGI to make Hirooka-CO a partner, which NGI did not do.

89.     During this time, NGI was not required (and not willing) to share certain trade-secret information with Hirooka-CO about NGI's own combination/bundle of services, pricing, and profit allocations involving NGI and Partner-CO exclusively.

90.     Indeed, NGI and Partner-CO had always guarded NGI's service-pricing and profit allocations as highly confidential, valuable, and sensitive secrets.

91.     No one outside of the General Partnership knew the information about NGI's service-pricing and profit allocations.

92.     There would have been no way for the information about NGI's service-pricing and profit allocations to be acquired properly by others.

93.     NGI and Partner-CO had never shared the information about NGI's service-pricing and profit allocations except with lawyers, accountants, or agents who needed to know.

94.     NGI invested time, money, research, and other valuable resources of many years to build up a remarkably efficient, effective, and profitable combination of services, pricing, and profit allocations that had substantial and independent economic value—especially to competitors.

95.     The success of NGI's business was based, in substantial part, upon the confidential, proprietary information, and trade secrets developed and used by NGI, which was not disclosed to the general public or to NGI's competitors, especially not to Hirooka-CO.

96.     However, on May 16, 2017, Partner-CO (via Vibrant, Mr. Nassar, and under the direction of Mr. Ziade) improperly transmitted—by interstate wire or mail, or both—directly to Hirooka-CO (without NGI's knowledge or consent) the sensitive and highly-protected trade secrets

16

involving NGI's service-pricing and profit allocations known previously only to Partner-CO and NGI.

97.     Hirooka-CO instantly recognized that NGI's trade secrets held independent economic value because the information was not generally known to, and not readily ascertainable by proper means by the public or any other persons who could obtain commercial or economic value from its disclosure or use.

98.     While immediately prior to the disclosure (i.e., April-May 2017), the negotiations between NGI and Hirooka-CO had seemed on track for NGI to work with Hirooka-CO in some way, the negotiations broke down after the disclosure because of Hirooka-CO's misconduct and misuse of the confidential information.

99.     Hirooka-CO had wanted and had received from Partner-CO, by interstate wire or mail, or both, the highly confidential service-pricing and profit allocations for NGI's part of the General Partnership, including the gross revenues earned and service-mix performed by NGI pertaining to several recent joint-ventures including those involving acquaintances of Hirooka-CO.

100.    Pursuant to the NC-NDAs, Hirooka-CO was not permitted to disclose or to use such confidential trade secrets or to compete against NGI.  (Ex. 1-2.)

101.    Nevertheless, beginning May of 2017, Hirooka-CO made fraudulent demands— through the interstate wires or mails or both—that Hirooka-CO was entitled to 80% of NGI's share of profits for <u>four</u> separate projects; and then a <u>fifth</u>; and a <u>sixth</u>; and a <u>seventh</u>; and an <u>eighth</u>, **all in or near Las Vegas, Nevada**.

102.    Hirooka-CO intentionally disrupted the contractual relationship between NGI and Partner-CO, conspiring with Partner-CO to withhold NGI's shares of NGI's profits.

103.    Hirooka-CO intentionally disrupted NGI's prospective economic advantages for each of the eight projects and many more that followed.

1379800v.4

104.     Hirooka-CO used the wires or mail to make a fraudulent claim to NGI's money in breach of the NC-NDAs without any right—and without any evidence of any right—of Hirooka-CO to do so.

105.     On approximately June 4, 2017, Mr. TF (of Sansei AimConsul Inc.) conferred with the principals of NGI and confirmed that Ms. AS would be traveling to Las Vegas, Nevada, where NGI and Partner-CO had several projects that Ms. AS could visit, if she wanted.

106.     On approximately July 17-18, 2017, both Partner-CO and NGI reminded Hirooka-CO that that there was no legally permissible way for Hirooka-CO to exclude NGI from its own General Partnership.

107.     On approximately July 17-18, 2017, using interstate wire, or mails, or both, Hirooka-CO published fraudulent, false, and disparaging statements about NGI for the purpose of disrupting the General Partnership and to misdirect NGI's share of profits to Hirooka-CO.

108.     With malice and intent, Hirooka-CO falsely stated that Hirooka-CO was entitled to NGI's profits from the General Partnership; Hirooka-CO falsely stated that NGI *intentionally* performed its services in an "unprofessional business manner"; Hirooka-CO stated that current or past clients of NGI and (joint venture partners of the General Partnership) did not "want to pay a[] single cent[] to" NGI because NGI "had an ill intention" to delay "sending the closing documents on time"; Hirooka-CO falsely stated that certain existing clients and prospective clients of NGI (and prospective joint-venture partners of the General Partnership) were instead clients "and guests" of Hirooka-CO; and Hirooka-CO falsely stated that NGI's new agent, Mr. TF, was instead a client of Hirooka-CO—which was impertinent given the fact that Hirooka-CO was not part of the General Partnership or NGI.

109.     In response, NGI stated that it would be consulting with a lawyer about Hirooka-CO's conduct.

18

1379800v.4

110.     On July 26, 2017, NGI re-confirmed in writing to Hirooka-CO (and Mr. Ziade, on behalf of Partner-CO) there were no "legal agreements between" Hirooka-CO and NGI (or the General Partnership) that would give Hirooka-CO any right to any profits of NGI and the General Partnership; and, NGI asked Hirooka-CO to cease making disparaging statements about NGI's principals.

111.     Subsequently, however, Partner-CO knowingly and wrongfully withheld NGI's share of the profits for the projects; and, Partner-CO wrongfully withheld NGI's share of profits for additional projects that had nothing to do with Hirooka-CO.

112.     Hirooka-CO engaged in a pattern of racketeering activity including fraudulent claims to eight joint-venture projects under the General Partnership, and then additional projects where none of Hirooka-CO's acquaintances had become clients of NGI.  Hirooka-CO's interference endured and expanded to other projects in 2017 and 2018.

113.     Hirooka-CO entered an illicit and tacit agreement to conspire with Partner-CO— using interstate wires and mail—and they did conspire for the following unlawful objectives:

   a.  for Partner-CO to withhold NGI's share of profits for numerous joint ventures under the General Partnership, which continues to this day;

   b.  to misappropriate NGI's trade secrets for the benefit of Hirooka-CO;

   c.  to defame and disparage NGI by both Hirooka-CO and Partner-CO including in NGI's market, and to NGI's existing and prospective clients;

   d.  to intentionally interfere with NGI's existing contracts and prospective economic advantages;

   e.  for Partner-CO to renounce and break-up the General Partnership with NGI; and,

   f.  for Hirooka-CO to replace NGI in a new general partnership where Hirooka-CO and Partner-CO have used, and continue to use, NGI's trade secrets.

19

1379800v.4

114.    Using interstate wires and mail, Hirooka-CO and Partner-CO actually accomplished each of the unlawful objectives.

115.    On approximately August 11, 2017, Ms. AS and Mr. TF (of Sansei AimConsul Inc.) traveled to Nevada and spent time with the principals for NGI and Partner-CO.

116.    In the evening of August 11, 2017, NGI's principals and Partner-CO's principal (Mr. Ziade) spoke with Ms. AS and Mr. TF about discussing business the next day.

117.    However, Ms. AS and Mr. TF stated that they wanted some rest and preferred leisure time instead of discussing or visiting real estate properties.

118.    NGI's principals communicated this fact to Hirooka-CO.

119.    Ms. AS expressed her lack of interest in owning real property in or near Las Vegas, Nevada.  Ms. AS stated that she did not want to own property in or near Las Vegas.

120.    Even so, when Hirooka-CO arrived in Las Vegas in the evening of August 11, 2017, Hirooka-CO repeatedly attempted contact with Ms. AS to revive the business meeting with Partner-CO.

121.    The next day, Hirooka-CO in fact went around the principals of NGI, communicating with Partner-CO through the interstate wires or mails, or both, attempting to go directly to Partner-CO in direct competition with NGI.

122.    On August 12, 2017, Hirooka-CO effectively persisted and persuaded Ms. AS to meet with Partner-CO, but without the principals of NGI.

123.    Hirooka-CO and Partner-CO conspired for the purpose of harming NGI.

124.    On approximately November 8, 2017, Partner-CO communicated through the interstate wires or mails, or both, that Partner-CO unilaterally sought to dissolve the General Partnership for the illicit purpose of competing against NGI with Hirooka-CO, and to publish defamatory statements about NGI.

20

1379800v.4

125.     On approximately November 28, 2017, Mr. Ziade, for Partner-CO, traveled through interstate commerce and to Japan to meet with Hirooka-CO for the illicit purpose of competing against NGI with Hirooka-CO.

126.     On approximately December 1, 2017, Hirooka-CO came to Las Vegas and began a series of illicit joint-ventures with Partner-CO in direct competition with NGI.

127.     Since May 16, 2017, Hirooka-CO has misappropriated and used NGI's trade secrets for the malicious purpose of conspiring with Partner-CO (and others) to harm NGI and to commit numerous violations of law—including predicate offenses of RICO—some of which Hirooka-CO continues to do to this day.

C.     *Partner-CO's Racketeering Activities, Mail & Wire Fraud, Forgery, Breach of Fiduciary Duties, Inter Alia—for the Joint Venture AJ1*

128.     In 2017, NGI began discovering other evidence of a pattern of illegal conduct by Mr. Ziade and Partner-CO as demonstrated in two of the joint-ventures.

129.     Among the projects, the General Partnership managed two particular joint-venture projects under two separate Nevada limited-liability companies referred to as AJ1 (April 2013) and AJ2 (July 2014), respectively.

130.     Without NGI's knowledge, Partner-CO engaged in multiple counts of flagrant self-dealing, and Partner-CO delayed these projects to work on Partner-CO's own secret projects outside of the General Partnership to the detriment of, and in breach of the duty of loyalty to, NGI (and the joint venture partners).

131.     In approximately February to March of 2013, Partner-CO recommended a joint–venture for the General Partnership to purchase and sell properties over a very short term using the entity AJ1.

21

1379800v.4

132.    In June 2014, after approximately two successful short-term joint ventures under AJ1, Mr. Ziade for Partner-CO recommended that NGI, Partner-CO, and the joint-venture partners delay receipt of their profits to keep most of their money in AJ1 for 360 days: to purchase raw land, located at 19 Pebble Hills, Las Vegas, Nevada; to construct a luxury home; to sell the home; and to share higher profits, which Ziade represented would be higher than 20% per year.

133.    The General Partnership used AJ1 as a 360-day short-term joint-venture to acquire the land for $300,000.00 (which Ziade misrepresented to be the financial security for NGI and the joint-venturers in AJ1), construct a luxury home (additional security), and sell the property.

134.    Notably, however, prior to acquiring the underlying raw land for $300,000.00 for AJ1, Partner-CO concealed the material fact that Partner-CO had already purchased the land for merely $127,500.00 through defendant Z Leb on December 21, 2012.

135.    Without disclosing its self-dealing, Partner-CO used interstate wires or mails to assess charges to the joint venture of $300,000.00—more than double Partner-CO's purchase price.

136.    Partner-CO used interstate wires or mails to mislead and conceal the fact that Partner-CO planned to sell the raw land to the AJ1 project at more than double the price that Partner-CO paid.

137.    Partner-CO derived income of $172,500.00 from its pattern of racketeering activity; and Partner-CO used that racketeering income of $172,500.00 to acquire an interest in and to operate its enterprise—which included Partner-CO's interests/ownership in, and control, over AJ1.

138.    In approximately May to June of 2014, Partner-CO concocting this scheme to defraud NGI by using the interstate wire or mail, or both to persuade NGI to believe that AJ1 would acquire the land in good faith for $300,000.00 for the joint-venture, AJ1; the construction would be completed within 360 days; and, the return to NGI and the joint-venture partners would be 22%.

1379800v.4

139.    NGI fulfilled its side in good faith for AJ1, but Partner-CO defrauded NGI regarding the ownership of the underlying property; and, Partner-CO substantially delayed work on AJ1 fraudulently and with tortious bad-faith breach of its contract with NGI.

140.    Partner-CO never transferred ownership of the property from Partner-CO to AJ1, which was intentional, fraudulent, and significantly increased the risks to NGI, which Partner-CO knew.

141.    Without knowledge of Partner-CO's fraud, during 2015 and 2016, NGI and Partner-CO worked together as partners, sharing in costs and profits, and holding themselves out to each other and to the public as committed/exclusive partners, while keeping their joint and respective trade-secrets confidential.

142.    By June 2016, however, AJ1 was a full year behind the expectations agreed to by Partner-CO because of Partner-CO's breaches of its duty of loyalty (e.g., working on other projects to its own sole benefit and without disclosure) to NGI, mail and wire fraud, negligent misrepresentations, breach of contract, and unjust enrichment.

143.    Repeatedly, Partner-CO stated that the HOA had withheld permission for construction as Partner-CO's excuse for delays, but without any evidence.

144.    Yet, during that time, Partner-CO proceeded on other, illicit projects, in the same neighborhood, under the same HOA (e.g., 30 PD), without seeming to suffer the same delays.

145.    Partner-CO's illicit work on other projects, to the detriment and expense of NGI, constituted multiple breaches of Partner-CO's fiduciary duties of loyalty and care.

146.    NGI told Partner-CO, in June 2016, that NGI and the joint-venturers were concerned about Partner-CO's delays with AJ1, which were entirely caused by Mr. Ziade's bad faith on behalf of Partner-CO.

23

1379800v.4

147.    NGI did not know then that Partner-CO was allocating its time and resources to a different, illicit or undisclosed, project and was comingling funds and assets of AJ1 with AJ2, Growth Construction, Progressive Construction, Z Leb, and many other affiliates of Partner-CO, and using racketeering income to operate Partner-CO's enterprise.

148.    In response, on July 6, 2016, Partner-CO concocting another scheme to defraud NGI by using the interstate wire or mail, or both, to appear like another genuine excuse for the delays with AJ1.

149.    Mr. Ziade, on behalf of Partner-CO, instructed Mr. "Ziad Gharios," Sr. Operations Manager for "Growth Construction," to write a sham email purporting to be delivered to Philippe (and Patrick) Ziade to explain why the AJ1 project would be delayed for *another* 4 months.

150.    Mr. Ziade, on behalf of Partner-CO, forwarded that email via interstate wire or mail, or both, to NGI trying to pass it off as legitimate; but it was in fact a scheme to delay and defraud NGI; and to permit Partner-CO to make further use of its racketeering income to operate the Partner-CO enterprise.

151.    During the next four months, Partner-CO engaged in serial fraudulent communications for the purpose of misleading and delaying NGI while Partner-CO comingled funds and secretly worked on its separate project(s).

152.    After four months passed, in November 2016, NGI communicated again to Partner-CO (via by Mr. Ziade) that NGI and the AJ1 joint-venturers were losing trust in Partner-CO and were extremely nervous.  Indeed, they would have been petrified if they knew that they owned nothing because Partner-CO had retained complete ownership of the underlying security/property.

153.    In response, on December 28, 2016, Partner-CO concocting another scheme to defraud NGI by using the interstate wire or mail, or both, to deliver a sham/falsified Certificate of

24

Occupancy for AJ1, made to appear genuine for the purpose of misleading, delaying, and defrauding NGI.

154.    Partner-CO falsified the owner's name on the Certificate of Occupancy to state that AJ1 owned the property.  Underneath the falsified owner name, the Certificate of Occupancy showed that defendant Z Leb owned the property (for Mr. Ziade and Partner-CO, not AJ1).

155.    At all times, Partner-CO made sure that AJ1 never owned the property, and Partner-CO knew that that material fact would cause NGI to discover that its ownership in AJ1 was entirely unsecured (and uninsured)—which was an obvious, unjustifiable, fraudulent, and material breach of Partner-CO's duties to NGI, the General Partnership, and the AJ1 joint venture.

156.    By keeping the property in Partner-CO's own separately-controlled company, Z Leb, Partner-CO knew that it could have absconded with NGI's money at any time, and leave AJ1 with nothing.

157.    Mr. Ziade allocated all risks to NGI and Partner-CO's joint-venture partners.

158.    Mr. Ziade kept Mr. Ziade and his entities over-secured to the detriment of NGI and the joint-venture partners, which Mr. Ziade fraudulently concealed and actively covered up on behalf of Partner-CO.

159.    Partner-CO used racketeering activity to derive security for, or insurance of, Partner-CO's risks, while passing the costs of such insurance to NGI.

160.    Partner-CO intentionally and fraudulently hedged Partner-CO's investment at NGI's expense.

161.    Thus, as alleged above, in December 2016, Partner-CO altered the Certificate of Occupancy, a government-issued document, to conceal this material fact.

162.    Partner-CO used interstate mails or wire to transmit the fake Certificate of Occupancy, falsely showing AJ1 as the owner of the underlying property for the purpose of

25

1379800v.4

concealing Partner-CO's pattern of racketeering activities through the use of an additional racketeering activity.

163.    As alleged above, beginning in 2017, Partner-CO knowingly began engaging in illicit business deals with Hirooka-CO, which had been a source or client contact of NGI.

164.    In November 2017, Partner-CO announced/stated that Partner-CO unilaterally ceased operations with NGI, while keeping NGI's money, and exploiting NGI's client contacts.

165.    In 2017 and 2018, and in collusion with Hirooka-CO, Partner-CO began withholding NGI's shares of profits, misappropriating NGI's trade secrets, and spreading false, disparaging, and defamatory statements about NGI, which has caused substantial hardship on NGI.

166.    Near the beginning of 2018, Partner-CO again maliciously published false statements intended to harm NGI's reputation by, in part, accusing NGI of lying about Partner-CO's exclusive relationship/partnership with NGI.

167.    Near the beginning of 2018, Hirooka-CO maliciously published false statements intended to harm NGI's reputation by, in part, accusing NGI of lying about Partner-CO's relationship/partnership with NGI.

168.    On March 10, 2018, Hirooka-CO made numerous false and disparaging statements for the purpose of harming NGI including, in part, falsely stating that Partner-CO dissolved the relationship with NGI because NGI was involved in too many lawsuits, which was intended to undermine NGI's reputation.

169.    There were no lawsuits on or before March 10, 2018 involving NGI.

170.    Instead, NGI was being forced to bring this case.

171.    Hirooka-CO's disparaging statements were intended to cause harm to NGI directly related to its business in Las Vegas, Nevada.

26

1379800v.4

172.   In 2018, Partner-CO and Hirooka-CO circumvented NGI for at least three separate projects in Nevada, causing substantial economic damage to NGI and to its reputation.

173.   Partner-OC misappropriated NGI's proprietary information, including NGI's *confidential* trade secrets, and conveyed the information to NGI's new direct competitor, Hirooka-CO, without consulting NGI and with full knowledge of Partner-CO and Hirooka-CO that such collusion would serve to harm NGI.

174.   It would be unfair to permit Partner-CO and Hirooka-CO to retain the benefit of NGI's investments of time and money in the Partner-CO brand names and trade secrets.

175.   NGI has been and will be damaged by Partner-CO's unfair retention of the benefits and value of the Partner-CO brand names and trade secrets.

176.   Defendants' past, current, and future use and misappropriation of NGI's trade secrets has damaged and will damage NGI severely.

177.   Defendants have colluded in an attempt to combine their enterprises for the purpose of unfairly eliminating or minimizing NGI's competition in the relevant markets.

## CAUSES OF ACTION

### I.   RACKETEERING PER 18 USCA § 1964(C) (RICO ACT)

### AGAINST PARTNER-CO

178.   Plaintiff NGI incorporates each allegation above.

179.   Each individual defendant of Partner-CO—Mr. Ziade and Mr. Nassar—is a member of the racketeering enterprise; and each entity-defendant of Partner-CO is being used partially or primarily as a member of the racketeering enterprise.

180.   Each member of Partner-CO has derived income from Partner-CO's pattern of racketeering activity.

1379800v.4

181.    Each member of Partner-CO has used racketeering income in acquiring an interest in or operating the enterprise.

182.    Partner-CO's patterns of racketeering activity include two or more predicate acts.

183.    Partner-CO's racketeering predicates are related and amount to, or pose a threat of, continued criminal activity.

184.    There is a nexus between Partner-CO's violations and the injury to NGI.

## II.    CAUSE OF ACTION

## CIVIL CONSPIRACY/COLLUSION AGAINST EACH DEFENDANT

185.    Plaintiff NGI incorporates each allegation above.

186.    Defendants intended to collude and combine in a concerted action, in a pattern of wrongful conduct, pursuant to an explicit or tacit agreement between the Defendants.

187.    Defendants intended to accomplish unlawful objectives against NGI for the purpose of harming NGI.

188.    Hirooka-Co knew of, induced, and even encouraged Partner-CO to undermine NGI's existing business relationships and prospective economic advantages in the market.

189.    Defendants, by way of their combined concert of action, actually engaged in a collusive scheme against NGI for the unlawful purpose of harming NGI.

190.    As a result of Defendants' combined concert of action and collusive scheme against NGI, Plaintiff NGI has suffered damages in excess of $2 million and foreseeable opportunity costs to its reputation and business relationships.

## III.    MISAPPROPRIATION OF TRADE SECRETS

## AGAINST PARTNER-CO

191.    Plaintiff NGI incorporates each allegation above.

1379800v.4

192.    Partner-CO knew the information that comprised NGI's trade secrets, as well as the joint trade-secrets of the General Partnership.

193.    Partner-CO knew that NGI's trade secrets were valuable.

194.    NGI certainly undertook efforts to maintain the secrecy of its trade secrets, including relying on an express agreement signed by Ziade on behalf of himself and Partner-CO to preserve NGI's trade secrets.

195.    Partner-CO was aware of its express or implied duty not to disclose NGI's trade secrets.

196.    Prior to 2017, NGI believed that Partner-CO undertook reasonable efforts to maintain the secrecy of NGI's trade secrets and those of the General Partnership.

197.    Partner-CO misappropriated NGI's trade secrets through both use and disclosure of NGI's trade secrets in breach of an express or implied duty not to disclose.

198.    Partner-CO knew that Hirooka-CO was a threatened direct-competitor of NGI, and became a direct competitor in substantial part because of Partner-CO's misconduct.

199.    NGI invested time, money, research, and other valuable resources over many years to build up its client network and service-bundles that became a body of information not generally known to or readily ascertainable by others.  Such information has or had substantial and independent economic value.

200.    NGI made reasonable efforts to maintain the secrecy of this information, relying on Partner-CO's duty of good faith and fair dealing (at a minimum) as the co-partner with NGI.

201.    The success of NGI's business is based, in substantial part, upon the confidential, proprietary information, and trade secrets developed and used by NGI, which is not disclosed to the general public or to NGI's competitors, especially Hirooka-CO.

202.    Partner-CO knew that maintaining the confidentiality of NGI's information was critical to the success of NGI's business.

203.    Partner-CO knew that NGI deemed such information confidential and proprietary, and that such information constituted trade secrets of NGI.

204.    Partner-CO purposefully and with conscious disregard acted independently and in collusion with Hirooka-CO and Hirooka & Hirooka to give Hirooka-CO access to NGI's trade secret information to harm to NGI.

205.    Partner-CO disclosed and improperly used NGI's trade secrets to Partner-CO's own benefit.

206.    As a result of Partner-CO's wrongful actions, NGI has suffered and will continue to suffer irreparable injury for which there is no adequate remedy at law.

207.    NGI seeks injunctive relief precluding, enjoining, and restraining Partner-CO's use and dissemination of NGI's trade secrets.

208.    As a direct and proximate result of Partner-CO's conduct, NGI has suffered monetary damages in an amount to be determined at trial.

209.    In light of the malicious and egregious conduct of Partner-CO, NGI is entitled to punitive damages in an amount to be determined at trial.

### IV.    MISAPPROPRIATION OF TRADE SECRETS
### AGAINST HIROOKA-CO

210.    Plaintiff NGI incorporates each allegation above.

211.    Hirooka-CO knew the information that comprised NGI's trade secrets, and learned the joint trade secrets of the General Partnership.

212.    Hirooka-CO knew that NGI's trade secrets were valuable.

30

213.     Hirooka-CO knew that NGI undertook efforts to maintain the secrecy of its trade secrets, including relying on an express agreement signed by Hirooka-CO to preserve NGI's trade secrets.

214.     Hirooka -CO was aware of its express contractual duty not to use or disclose NGI's trade secrets.

215.     From February to May 2017, NGI believed in good faith that Hirooka-CO undertook reasonable efforts to maintain the secrecy of NGI's trade secrets and those of the General Partnership.

216.     Hirooka-CO misappropriated NGI's trade secrets through use of NGI's trade secrets in breach of an express contractual duty not to disclose or compete against NGI.

217.     Hirooka-CO knew that Hirooka-CO could become a direct-competitor of NGI but only through improper collusion with Partner-CO.

218.     Hirooka-CO knew that NGI invested time, money, research, and other valuable resources over many years to build up its client network and service-bundles that became a body of information not generally known to or readily ascertainable by others.  Hirooka-CO knew that such information has or had substantial and independent economic value.

219.     Hirooka-CO knew that NGI made reasonable efforts to maintain the secrecy of this information, relying on Hirooka -CO's duty of good faith and fair dealing (at a minimum).

220.     Hirooka-CO knew that the success of NGI's business was based, in substantial part, upon the confidential, proprietary information, and trade secrets developed and used by NGI, which was not disclosed to the general public or to NGI's competitors, especially Hirooka-CO.

221.     Hirooka-CO knew that maintaining the confidentiality of NGI's information was critical to the success of NGI's business.

31

222.    Hirooka-CO knew that NGI deemed such information confidential and proprietary, and that such information constituted trade secrets of NGI.

223.    Hirooka-CO purposefully and with conscious disregard acted independently and in collusion with Partner-CO to give Hirooka-CO access to NGI's trade secret information to harm to NGI.

224.    Hirooka-CO disclosed and improperly used NGI's trade secrets to Hirooka-CO's own benefit.

225.    As a result of Hirooka-CO's wrongful actions, NGI has suffered and will continue to suffer irreparable injury for which there is no adequate remedy at law.

226.    NGI seeks injunctive relief precluding, enjoining, and restraining Hirooka-CO's use and dissemination of NGI's trade secrets.

227.    As a direct and proximate result of Hirooka-CO's conduct, NGI has suffered monetary damages in an amount to be determined at trial.

228.    In light of the malicious and egregious conduct of Hirooka-CO, NGI is entitled to punitive damages in an amount to be determined at trial.

## V.    PREDICATE OFFENSES: WIRE FRAUD & MAIL FRAUD (18 USC §§ 1341, 1343) AGAINST PARTNER-CO

229.    Plaintiff NGI incorporates each allegation above.

230.    Partner-CO implemented schemes to defraud, make false representations, and use interstate communications with the intent to deceive NGI into believing that Partner-CO was preserving the confidential information of NGI; and that Partner-CO was preventing Hirooka-CO and others from circumventing or undermining NGI with the General Partnership.

231.    Partner-CO devised or intended to devise the scheme to obtain money or property by means of false or fraudulent pretenses, representations, or promises to NGI.

32

232.    Partner-CO transmitted or caused to be transmitted by means of U.S. mails, wire, radio, or television communication in interstate and foreign commerce, certain writings, signs, signals, pictures, or sounds for the purpose of executing Partner-CO's schemes.

233.    As a direct and proximate result of Partner-CO's fraudulent uses of the mails, or wires, or both, Plaintiff NGI has suffered damages in excess of $2 million and foreseeable opportunity costs to its reputation and business relationships.

## VI.    COMMON LAW FRAUD

## AGAINST PARTNER-CO

234.    Plaintiff NGI incorporates each allegation above.

235.    Partner-CO made a false representations.

236.    Partner-CO knew or believed the representations were false or Partner-CO had an insufficient basis for making the representations.

237.    Partner-CO intended to induce NGI to act or refrain from acting in reliance upon the misrepresentations.

238.    NGI justifiably relied on the misrepresentations.

239.    As a direct and proximate result of Partner-CO's fraud, NGI has suffered damages in excess of $2 million and foreseeable opportunity costs to its reputation and business relationships.

## VII.    NEGLIGENT MISREPRESENTATION

## AGAINST PARTNER-CO

240.    Plaintiff NGI incorporates each allegation above.

241.    Partner-CO, in the course of Partner-CO's business, profession or employment, and in through actions in which Partner-CO has a pecuniary interest, supplied false information for the guidance of NGI in its business transactions.

242.    NGI justifiably relied upon the information.

33

243.     Partner-CO failed to exercise reasonable care or competence in obtaining or communicating the information.

244.     Partner-CO caused pecuniary loss to NGI.

245.     NGI suffered damages resulting from, and caused by, such misconduct for which NGI is entitled to actual damages in excess of $2 million and punitive damages.

## VIII.   BREACH OF FIDUCIARY DUTIES

## AGAINST PARTNER-CO

246.     Plaintiff NGI incorporates each allegation above.

247.     As a partner or co-joint-venturer, Partner-CO owed NGI fiduciary duties of loyalty and care.

248.     Partner-CO was required to maintain, in good faith, the General Partnership's best interests over anyone else's interests.

249.     Partner-CO breached its fiduciary duties through intentional misconduct, fraud, and knowing violations of the law.

250.     Partner-CO's breaches of its fiduciary duties caused pecuniary loss caused to NGI.

251.     As a direct and proximate result of Partner-CO's misconduct, NGI has suffered damages in excess of $2 million and foreseeable opportunity costs to its reputation and business relationships.

## IX.     TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS

## AGAINST PARTNER-CO

252.     Plaintiff NGI incorporates each allegation above.

253.     Partner-CO knew of NGI's contractual relationships with the joint-venture partners and NGI's clients, including Hirooka-CO.

34

1379800v.4

254.    Partner-CO intentionally acted, intended, and designed its tactics to disrupt the contractual relationships of NGI.

255.    Partner-CO actually disrupted NGI's contractual relationships, which resulted in and caused damages to NGI, which has lost and will continue to lose the benefit of the bargain.

256.    NGI suffered damages resulting from, and caused by, such misconduct for which NGI is entitled to actual damages in excess of $2 million, and punitive damages.

## X.    TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS AGAINST HIROOKA-CO

257.    Plaintiff NGI incorporates each allegation above.

258.    Hirooka-Co knew of, induced, and even encouraged Partner-CO to agree to undermine Partner-CO's valid and existing contractual relationship with NGI, including each of the joint ventures at issue and the General Partnership.

259.    Hirooka-Co intentionally acted, intended, and designed its tactics to disrupt the contractual relationships.

260.    Hirooka-Co actually disrupted NGI's contractual relationships, which resulted in and caused damages to NGI; and NGI has lost and will continue to lose the benefits of those bargains.

261.    NGI suffered damages resulting from, and caused by, such misconduct for which NGI is entitled to actual damages in excess of $2 million, and punitive damages.

## XI.    TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST PARTNER-CO

262.    Plaintiff NGI incorporates each allegation above.

263.    Partner-CO knows of NGI's existing and potential contractual relationships with NGI's existing and potential clients, including Hirooka-CO.

264.    Partner-CO intended to harm NGI by preventing the relationships.

35

1379800v.4

265.    Partner-Co intentionally acted, intended, and designed its tactics to disrupt NGI's prospective economic advantages.

266.    Partner-CO cannot resort to any privilege or justification.

267.    Partner-CO actually disrupted NGI's existing and prospective economic advantages causing damages; and, NGI has lost and will continue to lose its economic advantages.

268.    Partner-CO actually disrupted NGI's prospective economic advantages, which resulted in and caused special, direct, and consequential damages to NGI.

269.    As a direct and proximate result of Partner-CO's misconduct, NGI has suffered damages in excess of $2 million and foreseeable opportunity costs to its reputation and business relationships.

## XII.    TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE AGAINST HIROOKA-CO

270.    Plaintiff NGI incorporates each allegation above.

271.    Hirooka-CO knew of NGI's prospective contractual relationships between NGI and the joint-venture partners, and the General Partnership.

272.    Hirooka-CO intended to harm NGI by preventing the relationships.

273.    Hirooka-Co intentionally acted, intended, and designed its tactics to disrupt NGI's prospective economic advantages.

274.    Hirooka-CO cannot resort to any privilege or justification.

275.    Hirooka-Co actually disrupted NGI's existing and prospective economic advantages causing damages; and, NGI has lost and will continue to lose its economic advantages.

276.    As a direct and proximate result of Hirooka-CO's misconduct, NGI has suffered damages in excess of $2 million and foreseeable opportunity costs to its reputation and business relationships.

36

1379800v.4

## XIII.   BUSINESS DISPARAGEMENT

### AGAINST PARTNER-CO

277.   Plaintiff NGI incorporates each allegation above.

278.   Partner-CO made false and defamatory statements asserting that NGI lied about its exclusive relationship with Partner-CO.

279.   Partner-CO wrongfully made statements to NGI customers, such as Hirooka-CO, to undermine the customers' reasonable assurances of NGI's ability to fulfill duties to clients.

280.   Partner-CO's statements were false, disparaging, unprivileged, and malicious.

281.   Partner-CO published the false and defamatory statements via unprivileged communications to other persons for the malicious purpose of harming NGI.

282.   Damages are presumed and, as a direct and proximate result of Partner-CO's misconduct, NGI has suffered damages in excess of $2 million and foreseeable opportunity costs to its reputation and business relationships.

283.   Partner-CO's statements have caused and will continue to cause special damages to NGI, such as lost business income, lost opportunities, and a misperception of increased risk.

## XIV.   BUSINESS DISPARAGEMENT

### AGAINST HIROOKA-CO

284.   Plaintiff NGI incorporates each allegation above.

285.   Hirooka-CO made false and defamatory statements asserting that NGI lied about its exclusive relationship with Partner-CO; that NGI stole or tried to steal Hirooka-CO's clients and money; and that NGI could not fulfill NGI's duties to its clients.

286.   Hirooka-CO wrongfully made statements to the NGI customers to undermine the customers' reasonable assurances of NGI's ability to fulfill duties to clients.

1379800v.4

287.   Hirooka-CO's statements—conveying that NGI could not fulfill its promises—were false, disparaging, unprivileged, and malicious.

288.   Hirooka-CO published the false and defamatory statements via unprivileged communications to other persons for the malicious purpose of harming NGI.

289.   Damages are presumed and, as a direct and proximate result of Hirooka-CO's misconduct, NGI has suffered damages in excess of $2 million and foreseeable opportunity costs to its reputation and business relationships.

290.   Hirooka-CO's statements have caused and will continue to cause special damages to NGI, such as lost business income, lost opportunities, and a misperception of increased risk.

## XV.   BREACH OF CONTRACT
### AGAINST PARTNER-CO

291.   Plaintiff NGI incorporates each allegation above.

292.   Partner-CO has understood the material terms of the parties' agreements since 2013—terms expressed in writing, and through their course of dealings, and through their course of performance—and Partner-CO knew that NGI's valuable and propriety business information became, in part, the critical components of their partnership.

293.   Partner-CO knew that it had an obligation to protect NGI's proprietary information, trade secrets, and business interests.

294.   Partner-CO breached its contract with NGI by misappropriating NGI's trade secrets and business interests and conveying them to NGI's new direct competitor, Hirooka-CO.

295.   NGI has suffered damages equal to, at a minimum, NGI's benefit of the bargain, e.g., NGI's foreseeable damages, the value of NGI's use of the assets, special damages, and opportunity-costs, at a minimum.

## XVI.   BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING

## AGAINST PARTNER-CO

296.    Plaintiff NGI incorporates each allegation above.

297.    Partner-CO deliberately countervened the intention and spirit of the contracts and the business partnership with NGI.

298.    Partner-CO performed its duties in a manner that was unfaithful to the purpose of the contract.

299.    NGI's expectations were justified, but Partner-CO willfully violated those expectations while acting in bad faith.

300.    Partner-CO committed wrongful acts during the course of the parties' contractual relationship, which gives rise to both tort and contract remedies.

301.    Partner-CO's wanton and willful violations of its duty of good faith justify damages for intentionally tortious conduct, such as punitive damages, to deter Partner-CO and others from such bad faith.

302.    NGI suffered damages resulting from, and caused by, such misconduct for which NGI is entitled to actual damages in excess of $2 million and punitive damages.

## XVII.  BREACH OF CONTRACT

## AGAINST HIROOKA-CO

303.    Plaintiff NGI incorporates each allegation above.

304.    Hirooka CO understood all of the material terms of the NC-NDAs.

305.    Hirooka-CO knew that it had contractual obligations to protect NGI's proprietary information, trade secrets, and business interests; and not to compete against NGI.

306.    Hirooka-CO breached its contracts with NGI.

1379800v.4

307.    NGI has suffered damages equal to, at a minimum, NGI's benefit of the bargain, e.g., NGI's foreseeable damages, lost profits, the value of NGI's use of the assets, special damages, and opportunity-costs, at a minimum.

## XVIII. TORTIOUS BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST HIROOKA-CO

308.    Plaintiff NGI incorporates each allegation above.

309.    Hirooka-CO deliberately countervened the intention and spirit of the NC-NDAs with NGI.

310.    Hirooka-CO performed its duties in a manner that was unfaithful to the purpose of the contracts.

311.    NGI's expectations were justified, but Hirooka-CO willfully violated those expectations while acting in bad faith.

312.    Hirooka-CO committed wrongful acts during the course of the parties' contractual relationship, which gives rise to both tort and contract remedies.

313.    Hirooka-CO's wanton and willful violations of its duty of good faith justify damages for intentionally tortious conduct, such as punitive damages, to deter Hirooka-CO and others from such bad faith.

314.    NGI suffered damages resulting from, and caused by, such misconduct for which NGI is entitled to actual damages in excess of $2 million and punitive damages.

## XIX.   THIRD PARTY BENEFICIARY BREACH OF CONTRACT AGAINST HIROOKA-CO

315.    Plaintiff NGI incorporates each allegation above.

316.    Hirooka CO understood all of the material terms of the NC-NDA of March 26, 2016.

40

1379800v.4

317.    Hirooka-CO knew that it had a contractual obligation to protect NGI's proprietary information, trade secrets, and business interests.

318.    Hirooka-CO breached its contract with NGI.

319.    NGI has suffered damages equal to, at a minimum, NGI's benefit of the bargain, e.g., NGI's foreseeable damages, lost profits, lost reputation, the value of NGI's use of the assets, special damages, and opportunity-costs, at a minimum.

## XX.    UNJUST ENRICHMENT

## AGAINST PARTNER-CO

320.    Plaintiff NGI incorporates each allegation above.

321.    Partner-CO accepted and retained the benefit of NGI's investment of time and money to develop the brands/trademarks, the propriety consulting and marketing processes, NGI's trade secret and confidential information, and NGI's shares of profits of the General Partnership.

322.    It would be unfair to permit Partner-CO to retain the benefit of NGI's investment of time and money in the Partner-CO brands/trademarks, trade secrets and confidential information, and NGI's shares of profits of the General Partnership.

323.    NGI has been and will be damaged by Partner-CO's unfair retention of the benefits and value of the Partner-CO brands/trademarks, trade secrets and confidential information, and NGI's shares of profits of the General Partnership

324.    As a direct and proximate result of Partner-CO's unfair retention of the benefits, NGI has suffered damages in excess of $2 million and foreseeable opportunity costs to its reputation and business relationships.

## XXI.    UNJUST ENRICHMENT

## AGAINST HIROOKA-CO

325.     Plaintiff NGI incorporates each allegation above.

41

326.     Hirooka-CO accepted and retained the benefit of NGI's good faith and due diligence to explore the possibility of working together; Hirooka-CO understood the value of NGI's investments of time and money to develop the General Partnership and Partner-CO brands/trademarks, the propriety consulting and marketing processes, and NGI's trade secret and confidential information.

327.     It would be unfair to permit Hirooka-CO to enjoy and retain the benefit of NGI's investments of time and money spent on its trade secrets, confidential information, and for the Partner-CO brands/trademarks.

328.     NGI has been and will be damaged by Hirooka-CO's unfair retention of the benefits and value of the Partner-CO brands/trademarks, trade secrets, and confidential information.

329.     As a direct and proximate result of Hirooka-CO's unfair retention of the benefits, NGI has suffered damages in excess of $2 million and foreseeable opportunity costs to its reputation and business relationships.

## XXII.  PROMISSORY ESTOPPEL

### AGAINST PARTNER-CO

330.      Plaintiff NGI incorporates each allegation above.

331.     NGI detrimentally relied on Partner-CO's promises to act in a professional good-faith manner, to comply with partnership duties to NGI, to guard NGI's propriety information from NGI's competitors, and to preserve the integrity of NGI's proprietary information and business assets.

332.     NGI has conveyed valuable consideration, and made investments and commitments such that Partner-CO's promises should be binding.

333.     As a result of Partner-CO's breach of its promises, NGI has been damaged by NGI's detrimental reliance on Partner-CO's promises.

334.   As a direct and proximate result of Partner-CO's misconduct, NGI has suffered damages in excess of $2 million and foreseeable opportunity costs to its reputation and business relationships.

## XXIII. PROMISSORY ESTOPPEL

## AGAINST HIROOKA-CO

335.   Plaintiff NGI incorporates each allegation above.

336.   NGI detrimentally relied on Hirooka-CO's promises to act in a professional good-faith manner, to guard NGI's propriety information from NGI's competitors, and to preserve the integrity of NGI's proprietary information and business assets.

337.   NGI has conveyed valuable consideration, and made investments and commitments such that Hirooka-CO's promises should be binding.

338.   As a result of Hirooka-CO's breach of its promises, NGI has been damaged by NGI's detrimental reliance on Hirooka-CO's promises.

339.   As a direct and proximate result of Partner-CO's misconduct, NGI has suffered damages in excess of $2 million and foreseeable opportunity costs to its reputation and business relationships.

## XXIV. DECLARATORY RELIEF

## AGAINST DEFENDANTS

340.   Plaintiff NGI incorporates each allegation above.

341.   A justiciable controversy exists between NGI and the Defendants, whose interests are adverse.

342.   Since 2013, NGI and Partner-CO have worked jointly towards supplying the consulting market with unique, high-quality, information based on NGI's processes and decades of

1379800v.4

promotion of its branding, marketing, and accumulation of NGI's trade-secret and other confidential information and assets necessary for NGI's success in the market.

343.   In 2017 and 2018, Partner-CO and Hirooka-CO misappropriated NGI's trade secrets and substituted Hirooka-CO for NGI in many joint ventures, while continuing to use and rely on the branding/trademarks that NGI jointly developed with Partner-CO.

344.   NGI has a legally protectable interest in the controversy.

345.   The issues are ripe for judicial determination.

346.   NGI is entitled to declaratory relief awarding NGI legal and equitable title in the Partner-CO brands/trademarks ("Growth Holding," "Vibrant," "Growth Construction," "Growth Luxury Realty," "Growth Luxury Homes," "GLH," and others), NGI's sources or client contacts, the marketing, the NGI business processes, etc.; and, precluding both Hirooka-CO and Partner-CO from using or benefitting from the brands, the NGI clients, and the NGI's proprietary information.

347.   A constructive trust should be placed on all of the assets, money, and property of Partner-CO and Hirooka-CO in Nevada or related to their projects in Nevada.

348.   The Court should reform the NC-NDA of Feb. 17, 2017 regarding the forum selection clause to include Las Vegas, Nevada because all of the money for each project was spent and earned in Las Vegas, Nevada, on projects existing only in Las Vegas or nearby; and most of the defendants reside in Las Vegas, Nevada.

349.   The Court should reform any alleged or actual mandatory-arbitration-clauses to instead be permissive-arbitration-clauses because the mandatory-arbitration-clauses are unconscionable and otherwise improper.  Alternative, NGI may seek to dismiss those few members of the common enterprise that may be entitled to arbitration.

## XXV.  PRAYER FOR RELIEF

WHEREFORE, the Plaintiff demands judgment against the Defendants as follows:

44

a.  An Order permanently enjoining and restraining each Defendant, their agents, servants, employees, representatives, and all persons acting in concert or participating with Defendants or any one of them, from using or disseminating NGI's trade secrets and confidential proprietary business information, trade secrets, and assets;

b.  An Order preliminarily enjoining the transfer, conveyance, or sale of assets and information of the General Partnership;

c.  An Order permanently enjoining each Defendant from making disparaging statements about NGI to anyone;

d.  Awarding Plaintiff compensatory damages against each Defendant, including interest thereon, in amount to be determined at trial;

e.  Awarding Plaintiff punitive damages against each Defendant in amount to be determined at trial;

f.  Awarding Plaintiff its costs, legal expenses, and reasonable attorneys' fees incurred in connection with this action; and

g.  Awarding Plaintiff such other and further relief as this Court deems just and proper.

Plaintiff NGI demands a trial by jury.

DATED this 18th day of October, 2018.

WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP

BY:  */s/ J. Scott Burris*
       J. SCOTT BURRIS
       Nevada Bar No. 10529
       300 South 4th Street, 11th Floor
       Las Vegas, NV  89101
       Attorneys for Plaintiff Nikkei Global Inc.

45

1379800v.4